# Richmond

WARREN HOWARD CALDWELL v. COMMONWEALTH OF VIRGINIA.

June 15, 1964.

Record No. 5736.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*Dabney Overton* and *Blake T. Newton* (*Overton & Overton*, on brief), for the plaintiff in error.

*R. D. McIlwaine, III, Assistant Attorney General* (*Robert Y. Button, Attorney General*, on brief), for the Commonwealth.

SNEAD, J., delivered the opinion of the court.

Warren Howard Caldwell, defendant, was found guilty on a warrant charging that he did "operate a motor vehicle on the highways of the State of Virginia while under the influence of intoxicating beverages" (Code, § 18.1-54), and that he had been previously convicted of the same offense within a period of ten years. The jury fixed his punishment at a fine of $200 and by confinement in jail for a term of one month. Code, § 18.1-58. The case is before us upon writ of error and supersedeas to the judgment of conviction entered on the verdict.

On April 1, 1963, at approximately 7:45 p.m. trooper P. R. Jeffrey, Jr., was proceeding north on U. S. Route No. 17 in Essex county. He was "attempting to clock" the speed of a station wagon. When the speed of that vehicle was slackened he observed a pick-up truck in front of it traveling in the same direction, which was being driven by Caldwell, the defendant, over into the southbound lane and back into the northbound lane. The trooper was unable to pass defendant's truck and waited until it reached Brays Fork, a short distance away. There defendant turned his vehicle into a service station and ran it up on a curb between eight and twelve inches in height. The truck "rolled back" off the curb and defendant drove it again onto the curb. According to the trooper this performance occurred three times. The defendant alighted from his vehicle and the trooper

observed that he was "unsteady on his feet, his eyes were glassy, and he had thick speech." A "faint odor of alcohol" was detected on his breath. A bottle of vodka was found on the seat of the truck and defendant stated that he had "had a couple of drinks with a war buddy of his" from this bottle.

The trooper informed defendant that he was being placed under arrest for operating his vehicle under the influence of alcohol, and that "a new Virginia law required you to submit to a blood test." The trooper asked defendant "would he like to take one" and he replied: "[Y]es, let's go and get it over with now."

The trooper carried defendant to a justice of the peace who issued a warrant charging him with the offense for which he was tried and convicted. From there he was taken to the office of Dr. Douglas Andrews in Tappahannock where 20 c.c. of defendant's blood was extracted for chemical analysis.

The defendant testified that it was his intention to proceed south on Route No. 360 towards Richmond; that by mistake he took U. S. Route 17 where it intersects with Route No. 360; that after he had traveled a short distance he turned around and proceeded back, "looking at the signs" in order to turn left on Route No. 360; that while looking for the signs he "probably" crossed over the center line of the highway, and that he drove into the service station to get his bearings and information about making the desired turn. He further testified that he was not "intoxicated", and that an operation for varicose veins in his leg affected his ability to walk.

In his assignments of error defendant contends that the court erred in admitting in evidence the results of the blood test, and in refusing to strike the Commonwealth's evidence and dismiss the prosecution because (1) the Commonwealth failed to comply with the provisions of Code, § 18.1-55[1], the "Implied Consent Law", and (2) he "was

---

[1] § 18.1-55. "Use of chemical test to determine alcohol in blood; procedure; costs; evidence; suspension of license for refusal to submit to test.—* * *

"(b) Any person, whether licensed by Virginia or not, who operates a motor vehicle upon a public highway in this State on and after July one, nineteen hundred sixty-two shall be deemed thereby to have agreed as a condition of such operation to consent to, and shall be entitled to, have a sample of his blood taken for a chemical test to determine the alcoholic content thereof if he is arrested for a violation of § 18.1-54 * * *.

"(c) Only a physician, registered professional nurse or graduate laboratory technician, using some type of a cleanser or sterilizer for the instruments used and for the part of the body from which the blood is taken, other than alcohol or other substance which might in any way affect the accuracy of the test, shall withdraw blood for the purpose of determining the alcoholic content therein; where practicable, the physician of such person's choice shall withdraw said blood. The blood

deprived of his right not to give evidence against himself, as guaranteed to him under the Constitutions of Virginia and the United States."

The defendant contends that the Commonwealth failed to comply with Code, § 18.1-55 in that (1) the trooper failed to inform him of the provisions of the law; (2) the doctor who extracted his blood did not comply with the plain mandate of the statute; (3) he was deprived of his right to have a separate sample of his blood analyzed.

■ The defendant argues that the trooper failed to advise him "that he had the right to refuse to take such blood test; that he

---

sample shall be placed in each of two sealed containers provided by the Chief Medical Examiner. Upon completion of taking of the sample, the containers shall be resealed in the presence of the accused after calling the fact to his attention. The containers shall be especially equipped with a sealing device, sealed so as not to allow tampering, labelled and identified showing the person making the test, the name of the accused, the date and time of taking. One sample shall then be delivered by the person who withdrew it to the police officer for transporting or mailing to the Chief Medical Examiner; and the other sample shall be delivered to the person accused, * * *.

\* \* \* \* \*

"(f) * * * [W]hen the person arrested within two hours of the time of his arrest requests or consents to the taking of a blood sample for chemical analysis, if the result of such chemical analysis of the blood sample taken is not received in evidence at the trial for any reason whatever, including but not limited to the failure on the part of any person, *except the person arrested,* to comply strictly with every provision of this section, then the rights of the person arrested shall be deemed to have been prejudiced, and he shall be found not guilty of any offense under § 18.1-54, * * *. (Italics supplied.)

"(g) If a person, after being arrested and after having been advised by the arresting officer that the law of Virginia requires a person accused of the violation of §18.1-54 or of a similar ordinance of any county, city or town to permit a sample of his blood to be taken so that a test may be made of his blood to determine the alcoholic content thereof and that refusal to do so constitutes grounds for the revocation of the privilege of operating a motor vehicle upon the highways of this State, then refuses to permit the taking of blood for such a test and does further so refuse upon being taken before a committing justice, and being there again by the committing justice advised of the law requiring a blood test to be taken and the penalty for refusal, all within two hours of the alleged offense, and so declares again his refusal in writing upon a form provided by the committing justice, then no blood sample shall be taken.

"(h) * * * If such person refuses or fails to execute such declaration, the committing justice shall certify such fact and that the committing justice advised the person arrested that such refusal or failure, if found to be unreasonable, constitutes grounds for revocation of such person's license to drive upon the form and sign same. The committing or issuing justice shall forthwith issue a warrant charging the person refusing to take the test to determine the alcoholic content of his blood, with violation of this section, which warrant shall be executed as any other criminal warrant. The defendant shall be given a copy of said warrant."

Note: Section 18.1-55 was repealed by the 1964 General Assembly and § 18.1-55.1, which made substantial changes, was enacted in lieu thereof, effective July 1, 1964.

had the right to request same within a two-hour period; that if practicable, he had the right to have a physician of his own choice administer the blood test; or that he would be entitled to know the results of the test." He testified that he was told by the trooper that "it was a new State law that you had to take" a blood test, and that he would not have taken the test had he not been informed by the trooper that he was required under the law to do so. Thus, he says, he cannot be deemed to have consented to submit to the test, or to have waived his right not to consent.

Under the statute any person who operates a motor vehicle upon a public highway in this Commonwealth shall be deemed to have consented to, and shall be entitled to, have a sample of his blood taken for a chemical analysis to determine its alcoholic content when arrested for operating a motor vehicle while under the influence of alcohol. In *Walton* v. *City of Roanoke,* 204 Va. 678, 133 S. E. 2d 315, we said that "the defendant was not compelled under § 18.1-55 to submit to the blood test. He had a choice of either allowing the test to be made or refusing it." We adhere to that holding. However, the statute does require an accused to submit to a blood test in order to avoid prosecution for refusing to take it, which may result in the suspension of his operator's license if such refusal is found to be unreasonable. He has the power to refuse to submit to the test but no right to refuse it. Since there exists no "right to refuse" to submit to a blood test, the trooper was without authority to advise defendant that he had such a right. Furthermore, defendant orally consented to submit to the test so that it was not incumbent upon the trooper to advise him of the consequences if he refused. Had defendant refused to submit to the test, it then would have been the duty of the trooper to advise the accused that "refusal to do so constitutes grounds for the revocation of the privilege of operating a motor vehicle upon the highways of this State".

■ There is no provision in the statute which expressly requires that the arresting officer advise the accused of his rights to request a test within a two-hour period; to have, if practicable, a physician of his own choice to extract his blood, or to know the results of the test. These provisions are available to an accused but are merely directory, not mandatory, insofar as they apply to the arresting officer. We conclude that the failure of the trooper to inform defendant of the provisions of the statute complained of did not constitute a lack of compliance.

■ It is next contended that the doctor failed to comply with the

mandate of the statute, because the record does not show that the instruments he used in extracting defendant's blood were sterilized and because he did not personally perform certain acts prescribed by the statute. Defendant makes no claim that the containers were not especially equipped with a sealing device and were not sealed so as to prevent tampering.

The statute requires the using of "some type of a cleanser or sterilizer for the instruments used and for the part of the body from which the blood is taken, other than alcohol or other substance which might in anyway affect the accuracy of the test," in extracting blood for analysis.

Dr. Andrews testified emphatically that he washed defendant's arm with "an antiseptic surgical soap", which contained no alcohol or other substance which might in any way affect the accuracy of the test. With respect to sterilization of the instruments used, he had this to say:

"By Mr. Overton:

\*   \*   \*   \*   \*   \*

"Q. When you withdrew the blood sample, just how did you do that?

"A. The patient was seated in a chair, his arm was resting on our examining table, and a tourniquet, a stretchable rubber strip, was placed around his upper arm. This makes the veins stand out so I can better find the vein, and cause less pain. The accused's arm was then wiped off and washed off thoroughly with a surgical soap. The syringe was taken from its sterile container. It was a sterile needle. It was placed on the syringe—the needle was—then inserted into the vein, and twenty CC's of blood were withdrawn from the patient's vein.

\*   \*   \*   \*   \*

"Q. Dr. Andrews, I ask you if you can say of your own knowledge the instruments you used were sterilized?

"A. The instruments that I used were in a sterile container where sterile instruments are kept.

"Q. I ask you again, sir, can you say of your own knowledge that those instruments were sterilized?

"A. I cannot say of my own knowledge they were sterilized. They were in a container where the sterilized instruments are kept.

\*   \*   \*   \*   \*

"By the Court:

"Q. Was the apparatus working you stuck it in?

"A. They are sterilized in a steam-a large steam apparatus, under pressure. They are then taken out and placed with transfer forceps again in a sterile container, which contains several syringes and several needles and all.

"Q. Was the apparatus working, was it on this day?

"A. Yes, sir.

"Q. And you put them in the apparatus provided for this?

"A. They were in this container, in this sterile container, and I took them from the sterile container.

"Q. Did you have any reason to believe that they weren't all right?

"A. No, sir. I did not.

\* \* \* \* \*

"By Mr. Carlton:

\* \* \* \* \*

"Q. What is the office routine?

"A. The routine is that when a syringe has been used that it is placed in the cleaning solution in a separate container, a wet container. Mrs. *Glanagan* [nurse] takes this container, takes the syringes out, washes them in water, and places them in our pressure apparatus for sterilizing. It's called an autoclave.

"Q. What substance is used in cleaning and sterilizing those instruments previous to putting them in the sterile container?

"A. Soap is used to clean them, and then they are cleaned further with water. They are washed several times with water, then they are placed in the steam apparatus and sterilized by live steam under pressure."

Mrs. Louis Flanagan, office nurse for Dr. Andrews, testified in part as follows:

"By the Court:

"Q. What do you do with the instruments he uses to draw blood from people's arteries?

"A. When the syringes are used they are put in a solution, BD Syringe Cleaner—solution. And when—every morning I take those trays and wash them out with the BD Syringe Cleaner, and then I separate the syringes and wash them under running tap water, and then put them in a tray and in the autoclave, and autoclave them under twenty pounds of pressure for fifteen minutes.

"By Mr. Carlton:

"Q. What do you do with the tray?

"A. The tray is covered and each office has one of these covered sterile trays.

"Q. Is that routine?

"A. That is done every morning.

"Q. Every morning?

"By the Court:

"Q. Did you do that on April 1st?

"A. I do it every morning.

"By Mr. Carlton:

"Q. Was it done on April 1st, 1963?

"A. Yes, I did.

    \*      \*      \*      \*      \*

"By the Court:

"Q. When you talk about syringes, are those the syringes he uses to draw blood from the arms of these people accused of driving under the influence of liquor?

"A. Yes, sir.

"Q. Were those particular syringes sterilized as you have indicated there, did you have that process to go through on April 1st?

"A. Yes, sir.

    \*      \*      \*      \*      \*

"By Mr. Overton:

    \*      \*      \*      \*      \*

"Well, if that be true, and assuming Dr. Andrews did use a syringe and a needle to draw blood from that man's arm, you couldn't possibly testify that that syringe had been cleaned by you if you didn't see it done?

"A. I can testify that all the syringes in the office are cleaned and sterilized by me.

"Q. Every morning?

"A. Every morning."

In *Kyhl* v. *Commonwealth*, 205 Va. 240, 135 S. E. 2d 768, we said that the statute does not require that the instruments used in extracting blood be sterilized in the presence of the accused. The statute clearly states that the instruments must be cleansed or sterilized, but it does not specify by whom or when such must be done. We hold that there was sufficient evidence adduced for the jury to conclude

that the instruments used were properly sterilized before extracting defendant's blood.

The defendant argues that "The statute requires that the physician break open the containers [boxes], take out and open the vials sealed therein, withdraw the sample of blood and place it in the vials, close the vials and replace them in the containers, seal the containers and deliver one to the arresting officer and the other to the defendant." He points out that the trooper performed some of these acts. However, the evidence shows that they were done at the request of the doctor in his presence and in the presence of defendant.

The statute specifically requires that only a physician, registered professional nurse or graduate laboratory technician may extract the blood, and that after it has been placed in the vials, labelled and sealed, "One sample shall then be delivered by the person who withdrew it to the police officer * * * and the other sample shall be delivered to the person accused * * *." The statute does not specify that the person who extracts the blood must personally perform the other procedures mentioned. The evidence is uncontradicted that Dr. Andrews extracted defendant's blood. It is true that he did not actually hand the accused's sample to him. It was delivered to defendant by the trooper at the doctor's request and in his presence. That constituted a valid delivery by the doctor. We find that the doctor did not fail to comply with the statute on the grounds relied upon.

As has been stated defendant was given a sample of his blood. He was also given an instruction sheet containing the names and addresses of laboratories authorized to analyze his blood and stating, among other things, that the sample "should be taken or mailed without delay". Upon his arrival at the jail he was incarcerated and his sample was taken from him without objection by the jailer for safekeeping. No one offered to take or mail the sample for him nor did he make the request of anyone. The sample and the instruction sheet were returned to defendant when he was released about 18 hours later. He was asked:

"Q. Did you ever send it to any of those laboratories?

"A. No, sir. It said on those instructions that it had to be done immediately, right now, so seventeen or eighteen hours after I didn't figure it was worth sending in, so I throwed it away."

The instruction sheet did not state that the blood sample "must" be forwarded to a private laboratory "immediately". It stated: "To

insure the fullest possible protection of your rights, the container should be taken or mailed-without delay." If defendant had forwarded his blood sample after he was released it would have been "without delay." He made no inquiry or request and decided to throw away his sample. Under these circumstances it cannot be said that he was, through no fault of his own, deprived of his right to have his blood sample analyzed and the results thereof received in evidence. Thus, he was not entitled to have the prosecution dismissed under the provisions of the statute.

Finally, defendant contends that he was deprived of his right not to give evidence against himself in violation of § 8 of the Constitution of Virginia and the Fifth Amendment to the Constitution of the United States. In *Walton* v. *City of Roanoke, supra,* we held that § 18.1-55 was not violative of these constitutional provisions. The defendant does not attack the constitutionality of the statute itself but he contends that it is unconstitutional as applied in the case at bar. He argues that his submission to the blood test was unlawfully obtained because he was told by the trooper that he was required to submit under the statute and was not advised that he had the right to refuse such a test. There has been no showing of coercion. By operating his motor vehicle upon a public highway defendant, under the statute, was deemed to have consented to take the blood test. When asked if he would like to take the test, he expressly consented. As was previously said defendant had the power to refuse the blood test but he had no right to refuse it. We find that this contention is without merit.

We hold that the trial court did not err in admitting in evidence the certificate attested by the Chief Medical Examiner, which showed defendant's blood contained 0.18% alcohol by weight, and in refusing to strike the Commonwealth's evidence and dismiss the prosecution.

For the reasons stated, the judgment appealed from is

*Affirmed.*